UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
JONATHAN SMITH, TIFFANY FOSTER, DORRIS
HOLLIS, DEBBIE McCOY, and CHUCK ZLATKIN,


                                        Plaintiffs,                    Case No.: 12-cv-2002

                    -against-

NEW YORK METRO AREA POSTAL UNION
and CLARICE TORRENCE,

                                        Defendants.
-----------------------------------------------------------------------X




## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' ORDER TO SHOW CAUSE

                                                    Pitta & Giblin, LLP
                                                    120 Broadway, 28th Floor
                                                    New York, New York 10271


Vincent F. Pitta, Esq.
Barry N. Saltzman, Esq.
Michael Dzialo, Esq.

# TABLE OF CONTENTS

Preliminary Statement...................................................................................1

Factual Background......................................................................................2

Argument....................................................................................................4

      **PLAINTIFFS' MOTION FOR THE EXTRAORDINARY REMEDY OF
      INJUNCTION IN INTERNAL UNION AFFAIRS SHOULD BE
      DENIED...................................................................................................4**

    A.    *The Extraordinary Remedy of Injunctive Relief...................................4*

    B.    *Plaintiffs fail to Establish Irreparable Harm in A Situation In Which the Harm
        They Allege is Speculative, Not Imminent, As They Have Delayed in Seeking the
        Injunction and –An Administrative Structure Exists to Repair the Harm They
        Claim is Irreparable.............................................................................5*
            *1.   The harm alleged is speculative........................................6*
            *2.   Plaintiffs delayed in seeking relief...................................7*
            *3.   The Exclusive, Non-Judicial, Remedial System of the Department of
                Labor Obviates Irreparable Harm.................................7*
    C.    *Plaintiffs Fail to Establish a Likelihood of Success on Either of Their Two Claims
        for Relief............................................................................................9*

            *1.   Plaintiffs fail to meet their heightened burden of showing a
                "clear" or "substantial" likelihood of success where the relief
                they seek will both alter the status quo and grant them
                substantially all the relief they seek.................................9*
            *2.   Plaintiffs Cannot Succeed on their Claim that the Local Must Pay
                for the Distribution of Their Campaign
                Literature.......................................................................10*
            *3.   Plaintiffs Cannot Succeed on the Merits of the Reinstatement
                Claim.............................................................................14*
            *4.   Plaintiffs have failed to exhaust internal union
                remedies.........................................................................17*
            *5.   The balance of the equities and public policy and interest weigh
                against granting the
                injunction.......................................................................18*

Conclusion...............................................................................................20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

JONATHAN SMITH, TIFFANY FOSTER, DORRIS
HOLLIS, DEBBIE McCOY, and CHUCK ZLATKIN,

Plaintiffs,

Case No.: 12-cv-2002

-against-

NEW YORK METRO AREA POSTAL UNION
and CLARICE TORRENCE,

Defendants.

------------------------------------------------------------------X

Defendants New York Metro Area Postal Union (the "Local") and its President, Clarice

Torrence, respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Order to

Show Cause for a Preliminary Injunction.

## PRELIMINARY STATEMENT

In two (2) days, ballots will go out for the Local's officer elections. Having delayed in

seeking relief and upon an insufficient showing to support their claim, Plaintiffs, candidates in

that election, on a slate challenging the incumbent slate headed by President Clarice Torrence,

seek to gain an unfair advantage in that election by injecting an inexact judicial remedy, a

preliminary injunction, into an area where Congress, through the Labor Management Reporting

and Disclosure Act ("LMRDA"), has already established remedies that demand administrative

expertise.

As this Court pointed out in *Schalk v. Transp. Workers Union of Am., AFL-CIO*, 03 CIV.

8045 (PAC), 2007 WL 1310171 (S.D.N.Y. May 3, 2007), analysis of an LMRDA claim "starts

from the premise that a union's internal affairs should not be interfered with lightly" and that unions "should be self-governing, free from judicial oversight." *See id.,* quoting *Franza v. I.B.T.,* 869 F.2d 41, 48 (2d Cir.1989). The relief Plaintiffs seek starts from precisely opposite premise: that unions are presumed guilty until proven innocent and should be governed by means of judicial oversight. Inasmuch as no legal or factual basis supports Plaintiffs' inverse, conclusory standards, and, indeed the law and facts stand against them, relief must be denied.

## FACTUAL BACKGROUND

The Local is an affiliate of the American Postal Workers Union, AFL-CIO (the "National") and represents United States Postal Service employees in clerical, maintenance and motor vehicle crafts throughout Manhattan, the Bronx and northern New Jersey. *See generally* New York Metro Area Postal Union Constitution ("Local Constitution") (See the Declaration of Clarice Torrence, Exhibit A.) [1]

The Local Constitution has established the Election Committee as the body to perform the initial review of candidate protests. *See* Local Constitution Art. 12, § 1 *see also* Constitution and Bylaws of the American Postal Workers Union, AFL-CIO ("National Constitution"), Art. 12 § 1 (requiring local unions to establish election committees). A copy of the National Constitution is attached to the Torrence Declaration as Exhibit B.

In a letter dated February 16, 2012 (Plf. Ex. B) Plaintiffs' counsel claimed, among other things 1) that the Local had recently distributed a newsletter (the "Metro Minute Mail," Torrence Dec., Ex. G) that was in actuality campaign literature touting the incumbents' accomplishments and 2) that President Torrence, attempting to obtain an unlawful advantage in the election, had recently removed Plaintiff Zlatkin as "Editor" of the Local's newspaper ("The Union Mail"),

---

[1] All references to the Declaration of Clarice Torrence and the exhibits attached thereto shall be referred to herein as Torrence Dec., ¶ __, Ex. ___.

barred him from conducting his work in the union office as the Local's elected Legislative Director and "barred two elected directors and an elected shop steward from conducting union business." Through Counsel, Plaintiffs demanded that the Local pay for the distribution of their own campaign literature and that President Torrence's alleged actions against Zlatkin and the others be reversed.

The Election Committee responded by letter dated February 23, 2012 (Torrence Dec., Ex.H). It stated that, 1) because the newsletter had not contained campaign material, but rather information to members on union-management issues, the Local was under no obligation to pay for distribution of Plaintiffs' campaign literature; 2) Zlatkin had been removed as "Managing Editor" (not "Editor") of the newspaper because of his refusal to publish a newsletter; 3) Zlatkin's purported right to have an office had attached in connection with his role as Managing Editor, and not as the Local's Legislative Director; and 4) the Committee had not been able to address the allegations related to the directors and shop steward because the February 16 letter had not specifically identified them. Although Plaintiffs could have identified the individuals they had been referring to, or could have appealed the Election Committee's decision to the National Union (Local Constit. Art. 12, § 17; National Constit. Art. 12, §§8-10), they did neither. Instead they completed a complaint on March 2, 2012, sat and did nothing for roughly three (3) weeks, and then sprang their preliminary injunction demand on Defendants and the Court at what was practically the latest moment possible.

Plaintiffs seek to avoid the facts that each of the actions of which they complain was taken for legitimate reasons of union self-governance, entitled to judicial non-interference. Specifically:

- Newsletter – the Union had published newsletters prior to the election periodical. The February 2012 Metro Minute Mail newsletter merely informs members of

relvant events, free of campaign rhetoric or propaganda. See Torrence Dec. ¶ 45, Ex. G.

- Chuck Zlatkin – President Torrence removed Zlatkin from his Managing Editor position because of his refusal to cooperate with her efforts to save the Local from unnecessary expenditures he had the Union incur to the benefit of his own girlfriend. Torrence Dec. ¶ 21. President Torrence did not remove Zlatkin for political reasons.
- Tiffany Foster and Debbie McCoy – both Foster and McCoy engaged in efforts to sabotage the nomination process. Torrence Dec. ¶ 33. Foster was removed from her appointed position and steps were taken to prevent further abuse by McCoy, but both maintained their member rights. Torrence Dec. ¶ 34.
- Dorris Hollis – Hollis abused her position and was removed from it for attempting to be paid for services not requested or needed by the Union, prior to Hollis announcing her candidacy. Torrence Dec. ¶ 43.

In all cases, Plaintiffs were stopped from abusing their positions of trust but encountered no burden on their member rights.

## ARGUMENT

### PLAINTIFFS' MOTION FOR THE EXTRAORDINARY REMEDY OF INJUNCTION IN INTERNAL UNION AFFAIRS SHOULD BE DENIED.

#### A. *The Extraordinary Remedy of Injunctive Relief*

Plaintiffs acknowledge that to obtain the relief they seek they must satisfy the preliminary injunction standard. Plf. Mem. at [2]. As Plaintiffs themselves state the standard:

> A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

Plf. Mem. at [2], citing *New York City Triathalon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 312 (S.D.N.Y. 2010), and quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008).

Even under the most straightforward of circumstances a preliminary injunction is, as this court has stressed, "'one of the most drastic tools in the arsenal of judicial remedies,'" and "'should not be granted as a routine matter.'" *Raghavendra v. Trustees of Columbia Univ.*, 06

{00534927.DOC / }4

CIV6841(PAC) (HBP), 2008 WL 2696226 at *12 (S.D.N.Y. July 7, 2008) quoting *Hanson Trust PLC, HSCM v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 273 (2d Cir.1986) and *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990)." Thus, far from ever being routine, the preliminary injunction is "an extraordinary remedy" and so "should be granted only where the party seeking relief satisfies stringent pre-conditions." *Agrippa, LLC v. Bank of Am., N.A.,* 10 CIV 9478 PAC, 2011 WL 102677 at *3 (S.D.N.Y. Jan. 11, 2011), citing *Monserrate v. N.Y.S. Senate,* 599 F.3d 148, 154 (2d Cir.2010). Plaintiffs themselves acknowledge this. *See* Plf. Mem., p. 2 ("a preliminary injunction is an '*extraordinary* remedy that may only be awarded upon a *clear* showing that the plaintiff is entitled to such relief") (emphasis added).

Plaintiffs improperly seek to inject this extraordinary remedy into extraordinarily inappropriate circumstances: one in which the LMRDA mandates exclusively within the primary jurisdiction of the Secretary of Labor, not the federal courts, and one in which, the injunction would alter, not preserve, the status quo. Through judicial *fiat*, the Court would create a situation for the Secretary of Labor to address that would not otherwise exist; and one in which the issuance of an injunction would give Plaintiffs not preliminary relief, but the ultimate relief that they actually seek. Plaintiffs' would have the Court do all this on nothing more than their conjecture and surmise. Inasmuch as Plaintiffs' request threatens, rather than advances, the congressional scheme for Union elections, it should be summarily denied.

### B. *Plaintiffs fail to Establish Irreparable Harm in A Situation In Which the Harm They Allege is Speculative, Not Imminent, As They Have Delayed in Seeking the Injunction and –An Administrative Structure Exists to Repair the Harm They Claim is Irreparable*

As this Court has noted, irreparable harm is "'considered the single most important requirement in satisfying the standard'" for injunctive relief. *Raghavendra* at *12, quoting *Ahmad v. Long Island Univ.,* 18 F.Supp.2d 245, 247 (E.D.N.Y.1998) (quotations and citations

omitted); see also *Bernard v. Local 100, Transp. Workers Union of Am.,* 873 F. Supp. 824, 827 (S.D.N.Y. 1995) *aff'd sub nom. Bernard v. Local 100, Transp. Workers Union of Am., AFL-CIO,* 112 F.3d 67 (2d Cir. 1997) (denying injunction where Plaintiffs would not be irreparably injured); *New Watch-Dog Comm. v. New York City Taxi Drivers Union, Local 3036, AFL-CIO,* 438 F. Supp. 1242, 1252 (S.D.N.Y. 1977) (injunction denied in absence of irreparable harm).

1. ***The harm alleged is speculative***

To demonstrate a likelihood of irreparable harm, a plaintiff bears the burden of showing that "'the injury it will suffer is likely and imminent, not remote or speculative....'" *Raghavendra* at \*12 quoting *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995). Plaintiffs here fail. The harm they allege and fear is the loss of an election, and for that loss to be legally cognizable, it must be the likely result of the Local's allegedly wrongful actions. That the actions Plaintiffs complain of will cause them to lose the election—especially when they offer no evidence *whatsoever* that these actions have had any impact —is entirely speculative. Similarly, no "clear and convincing proof" is made that any of the actions challenged by the Plaintiffs are "part of a series of oppressive acts by the Union leadership that directly threaten the freedom of the members to speak out." *Maddalone v. Local 17, United Broth. of Carpenters & Joiners of Am.,* 152 F.3d 178, 184 (2d Cir. 1998). On the facts presented, each of the Locals' actions, albeit in publishing the newsletter and with respect to the Plaintiffs' appointed positions with the Local, have had no demonstrable affect on members rights. Accordingly, inasmuch as Plaintiffs alleged harm is speculative rather than irreparable, their request for an injunction should be denied.

### 2. Plaintiffs delayed in seeking relief

So too Plaintiffs' failure here to act promptly in seeking injunctive relief "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Raghavendra* at *12 quoting *Citibank, N.A. v.. Citytrust*, 756 F.2d 273, 277 (2d Cir.1985) (citation omitted); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir.1995) (a "presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief").

Plaintiffs' complaint was signed, verified and ready to be filed and served on March 2, 2012. Plaintiffs waited 17 days, until March 19, 2012, to actually file the complaint. They waited 20 days after the complaint was completed, until March 22, to seek injunctive relief. The time was not even used to exhaust their internal union remedies (those were abandoned before the complaint was completed) or in negotiations for settlement (those were never attempted or requested). Indeed, Plaintiffs' delay belies their claim that the harm here is irreparable and the matter urgent.

### 3. The Exclusive, Non-Judicial, Remedial System of the Department of Labor Obviates Irreparable Harm

Far from this being a case where Plaintiffs will suffer irreparable harm if this Court does not issue an injunction, it is one in which Congress has provided a detailed remedial scheme to address any harm a candidate might suffer—and, furthermore, a remedial scheme specifically designed to limit the role of the courts in addressing union election issues. The existence of "rerun" elections completely obviates Plaintiffs' claims of irreparable harm. *New Watch*-Dog, 438 F. Supp. At 1252 (noting that post-election remedies diminishes Plaintiffs' present claim of irreparable injury); *Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley*, 467 U.S. 526 (1984) (federal court cannot

grant injunction to block election in case brought by union members challenging election irregularities; members must seek recourse from the Secretary of Labor).

Under LMRDA Section 402, 29 U.S.C. 482, it is the Secretary of Labor who has the authority to investigate any election irregularities that a candidate may allege affected an election's outcome; it is the Secretary, not the individual candidates here, who has the authority to initiate legal action in federal court to challenge an invalid outcome. The Secretary may only initiate the investigation and, furthermore, only after the candidate has exhausted internal union remedies -- thus giving the union the opportunity to address and remedy the irregularities alleged, if the same is warranted.

Pursuant to LMRDA § 402 (c), 29 U.S.C. 412(c), a federal court only has the authority to overturn the results of an election in a case that has been brought by the Secretary. Any rerun election that the court mandates must be conducted under the Secretary's supervision. These remedies provided by Title IV for challenging the results of an election are "exclusive." LMRDA § 403, 29 U.S.C. § 483. By intruding upon the Secretary's purview of ensuring that union elections are conducted fairly, courts intrude upon Congress's decision to employ the "special knowledge and discretion" of the Secretary of Labor in determining what constitutes a fair election. *See McBride v. Rockefeller Family Fund*, 612 F.2d 34, 35-36 (2d Cir. 1979)

Moreover, preliminary injunctive relief granted by the court could prove, upon the Secretary's review, to have been entirely inappropriate, tipping the scales in favor of a party who benefited unnecessarily and unfairly from the court's aid. This Court need not, and should not, take that risk. On the grounds of lack of irreparable harm alone, the injunction must be denied.

**C.** ***Plaintiffs Fail to Establish a Likelihood of Success on Either of Their Two Claims for Relief***

Plaintiffs seek both to compel the Local to pay for their campaign literature and to have individuals reinstated that the Local has determined should no longer be in their former appointed positions. They fail to carry their burden as to either claim.

*1.* ***Plaintiffs fail to meet their heightened burden of showing a "clear" or "substantial" likelihood of success where the relief they seek will both alter the status quo and grant them substantially all the relief they seek***

In considering whether Plaintiffs have met the likelihood of success requirement, the Court must apply a heightened burden that requires the showing of "clear" or "substantial" likelihood. There are two reasons for this, each of which, on its own, would mandate the heightened standard.

First, this is not an ordinary, but a mandatory injunction. An ordinary injunction prohibits a party from taking an action that it was about to take. *See, e.g., Metro. Taxicab Bd. of Trade v. City of New York,* 633 F. Supp. 2d 83, 85 (S.D.N.Y. 2009) *aff'd,* 615 F.3d 152 (2d Cir. 2010) (preliminary injunction granted pending final adjudication of regulation's validity; allowing regulation to be implemented before final adjudication might result in a loss to plaintiffs that would not be compensated). This mandatory injunction would require the Local to do what it opposes doing: to expend union funds on a campaign that the candidates should pay for themselves; to return Plaintiffs to appointed positions that the Local has determined they should not hold. In both instances the Local would be forced to aid candidates in ways that the Secretary of Labor could later determine did harm to the fair election process, not good.

Second, an injunction here will provide the Plaintiffs with substantially all the relief sought—relief that cannot be undone if it later proves that the injunction was unwarranted. Campaign literature sent out at the Local's expense and candidates reinstated to appointed union

positions before the election is held is all Plaintiffs are after. In winning this preliminary injunction, they will have won their whole case!

Either one of these two factors, taken alone, requires a "clear" or "substantial" showing and thus alters the traditional formula by requiring that the movant demonstrate a yet greater likelihood of success than in the "ordinary" instance of the already "extraordinary" preliminary injunction remedy. As this court has recognized, "[t]he party seeking the injunction 'must show a "clear" or "substantial" likelihood of success where the injunction sought is mandatory—i.e., it will alter, rather than maintain, the status quo.'" *Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 492-93 (S.D.N.Y. 2009) *aff'd*, 594 F.3d 94 (2d Cir. 2010) quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir.2004); *see also S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990) (injunction going beyond preservation of status quo requires "a more substantial showing of likelihood of success"). The same heightened standard must be applied where the preliminary injunction provides the movant with substantially all the relief it seeks. *See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2d Cir. 1985); *Trustees of International Brotherhood of Teamsters v. Miele Sanitation*, 190 F.Supp.2d 625, 627 (S.D.N.Y. 2002) but *cf. Johnson v. Kay*, 860 F. 2d 529, 540-42 (2d Cir. 1988)(heightened standard not applied where not all relief sought would be granted). Therefore, although Plaintiffs would fail to meet either standard, for a likelihood of success, the heightened "clear" or "substantial" likelihood standard should be applied here.

## 2. *Plaintiffs Cannot Succeed on their Claim that the Local Must Pay for the Distribution of Their Campaign Literature.*

Plaintiffs' claim that the Local must pay for the distribution of their campaign literature entirely relies on two cases with facts that bare no resemblance to the facts here: *New Directions*

*v. Seda*, 867 F.Supp. 242 (S.D.N.Y 1994). *Guzman v. Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO*, 72 F.3d 260 (2d Cir. 1995) ("*Guzman I*").

In those two cases the campaign literature was immediately recognizable as such. It contained derogatory characterizations of the candidate's opponent, lavish praise of the candidate or both—the campaigning was impossible to miss. In the instance here, the newsletter is not campaign literature but a concise, precise and purely factual account of current issues in the Local's representation of Postal Service employees.

In *New Directions* the incumbent—writing in the first person—harshly criticizes his opponents, who comprised the "New Directions" slate, as caring only about their own interests, not the members' interests and well-being:

> It is obvious to me that New Directions wants—let me put this a little stronger—is praying for me and my fellow officers to fail in the negotiations so that they have an issue to run on later this year. In other words, New Directions wants you—the rank and file member—to get screwed on this contract so that they can say, "see, we told you so, vote for us."

*New Directions*, 867 F. Supp. at 243.

The literature at issue in the long-running *Guzman* litigation was a full-length book that had been mailed to all members, had nearly half its pages

> devoted to the period of [incumbent] Bevona's presidency. The incumbent president figures prominently in the narrative of recent events. Bevona's name appears on 51 of the 59 pages in the second half of the text, usually more than once, and the president is invariably portrayed in a very favorable light. A sample excerpt makes that crystal clear: "While completing preparation for a walkout, the union president brought to bear all the negotiating skills he developed in a 30-year career as a trade union professional." Bevona is among the subjects in at least 49 photographs in this section. The text closes with a 12-page comparison of the Local's "Achievements 'Before'" and "'During' the Bevona Administration," under the heading, "The Bevona Record: More for Members." [Plaintiff and challenger] Guzman's name is never mentioned in the book, but the publication devotes eight paragraphs to the 1992 election, belittling the opposition candidates led by Guzman for contesting the election and "inconvenienc[ing] the thousands of members who turned out to vote."

*Guzman v. Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO*, 151 F.3d 86, 88 (2d Cir. 1998) (*Guzman II*); *see also Guzman I*, 72 F.3d at 262 (describing the book as praising the actions of Union President Gus Bevona and suggesting that the 1992 Guzman slate was "a puppet for employers").

Plaintiffs assert that the Local here should be forced to pay for the distribution of their campaign literature because "the tone and content" of the Local newsletter, "falls squarely within the contours of *Guzman*, as is [sic] lavishly [emphasis added] praises the actions of the incumbent leadership." See Plaintiffs' Memorandum of Law at page 4. However, Plaintiffs' papers cannot quote this purported lavish praise because one would be hard-pressed to find any praise, lavish or otherwise, in the single spaced pages of statements such as:

> In the Bronx the issue of PSEs remaining while Clerks were excessed has been grieved and furthermore, the Union has filed unfair labor charges for this action with the National Labor Relations Board (NLRB). The Union will continue to fight for the rights of its members.

and

> National Officers advise that Bills 2309 and 1789 MUST BE OPPOSED! Both Bills are destructive to our future employment with the Postal Service. President Cliff Guffey stated that Bill 1789 must be amended because it gives short term relief but causes long term damage to the Postal Service.

See Torrence Dec., Ex. G.

The entire newsletter, a modestly produced document, continues in this vein. It does not contain a single name, either of an incumbent candidate praised or of a challenger candidate criticized. Ironically, the incumbents, had they wished to, could have promoted themselves far more vigorously—if only by including their names in the descriptions of what they had done— and yet would still have come well short of triggering the Local's duty to pay for Plaintiffs' campaign. *Guzman II* itself recognized that there was no campaign literature even in a far more elaborate presentation of union news by a magazine that covered "'incumbent candidates in their

respective representative capacities as active participants in matters of interest to the membership". 151 F.3d at 91, quoting *Sheldon v. O'Callaghan*, 335 F.Supp. 325, 328 (S.D.N.Y. 1971) (publication that informed members of activities of the union and that included "pictures of incumbent officers in the performance of their related activities" did not constitute campaign literature). Thus, far from meeting the Guzman standard, the Local's challenged newsletter does not even come close.

Perhaps even more telling than their silence on the contents of the newsletter is Plaintiffs' failure to present the Court or the Defendants with the avowed campaign literature which Plaintiffs claim that the Local must distribute for them. Absent such review, no injunction should issue. Plaintiffs' *New Directions* case makes clear that this Court has a responsibility to see to it that Plaintiffs—in the guise of eliminating an unfair advantage—do not themselves misuse the Court's power to obtain their own unfair advantage. The *New Directions* court fashioned its remedy to ensure that the challenger's literature did no more than even the playing field. The challenger was not allowed to make the union pay for campaign material longer than the incumbent's article; the material had to be "limited in content solely to a response to the article;" and, since the incumbent's article had used only the name of the New Directions slate, not its lead candidate, the response too could refer only to the challenger's slate and could not be used as an opportunity for that candidate to campaign under his own name. 867 F. Supp. at 245. Thus, although the Local maintains Plaintiffs' have failed to establish any basis whatsoever to have the Local pay for the mailing of Plaintiffs' campaign literature, their request should not even be considered since they have provided no such document to the Court.

### 3. *Plaintiffs Cannot Succeed on the Merits of the Reinstatement Claim*

Plaintiffs bring their reinstatement claims under LMRDA § 101(a)(2). That section states:

> Every *member* of any labor organization shall have the right to meet and assemble freely with other *members*; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2) (emphasis added).

Plaintiffs frame their papers as if the LMRDA was enacted not to protect the rights of *members* (as the text states) but to preserve the jobs of appointed union employees. As this Court recognized in *Schalk*, the LMRDA "only protects union members against a loss of membership rights." It does not protect union officials, *whether appointed or elected* "from losing rights related to their official position." *Schalk* at *5, citing *Green v. Brigham,* No. 03-cv-5190 (JG), 2005 WL 280327, at *4 (E.D.N.Y. Feb. 3, 2005); *United States v. I.B.T.,* 156 F.3d 354, 361 (2d Cir.1998); *Cotter v. Owens,* 753 F.2d 223, 226 (2d Cir.1985).

Accordingly, a union only violates the LMRDA with respect to actions union officials complain have been taken against them 1) where the action is taken in retaliation for the official's exercise of free speech in his or her capacity *as a member*; or 2) where the action is part of an ongoing "purposeful and deliberate attempt ... to suppress dissent within the Union." *Maddalone v. Local 17, United Bhd. of Carpenters & Joiners of Am.,* 152 F.3d 178, 184 (2d Cir.1998) (quoting *Schonfeld v. Penza,* 477 F.2d 899, 904 (2d Cir.1973)).

As to the first ground, there is no evidence here that the actions Plaintiffs complain of were in response to their "acting or speaking as a member" as opposed to "carrying out…official duties." *Schalk* at *5. On the contrary, as the Torrence Declaration makes clear, Torrence took steps she deemed necessary with respect to each Plaintiff because each proved unreliable, and untrustworthy in their duties. Torrence Dec. ¶¶, 21, 33, 42. Zlatkin failed to carry out his duties, Foster and McCoy attempted to sabotage the nomination process, and Hollis tried to obtain unwarranted payment from the Local. Torrence Dec. ¶¶, 21, 33, 42. The Local simply prevented Plaintiffs from abusing their positions for personal gain, a step well within the Local's right and duty. See e.g., *Finnegan v. Leu*, 456 U.S. 431 (1982) (holding that new union president may remove officers aligned with opponents); *Newman v. Local 1101, Communications Workers of Am.*, 570 F.2d 439 (2d Cir. 1978) (removal of steward opponent who could not be expected to fulfill duties advocated by the Union).

As to the second grounds, there is no allegation, or evidence, that actions of the Local were part of an ongoing "purposeful and deliberate attempt ... to suppress dissent within the Union". *Maddalone v. Local 17, United Bhd. of Carpenters & Joiners of Am.*, 152 F.3d 178, 184 (2d Cir.1998) (*quoting Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir.1973)). To fall within the coverage of this aspect of §102(a)(2), "a plaintiff must present 'clear and convincing proof' that the dismissal was '*part of a series of oppressive acts* by the union leadership that directly threaten the freedom of members to speak out.'" *Maddalone,* at 184 (*quoting Cotter,* at 229). *Schalk* at *5. Plaintiffs must be able to prove the existence of an "established union history or articulated policy" *Schonfeld v. Penza,* 477 F.2d 899, 904 (2d Cir.1973). Any alleged mistreatment must be more than "ad hoc personal retaliation;" it must be "part of a calculated and deliberate scheme to discourage dissent" among the union membership." *Maddalone* at 185.

Indeed, "it is perfectly permissible for an elected union leader to instill into his or her subordinate appointed employees the fear that if they are openly disloyal to the elected leaders, their union employment will be jeopardized." *Bentivegna v. Fishman*, No. 02 Civ. 4028, 2002 WL 1586957, at *14 (S.D.N.Y. July 17, 2002).

A plaintiff must be able to prove something along the lines of a long history of intra-union conflict (*Cotter v. Owens*, 753 F.2d 223, 229–30 (2d Cir.1985)) or a 15–year history of litigation between dissident group and leadership (*Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir.1973)) or disruption and intimidation at meetings, seizure of the union's headquarters and threats of physical harm (*Johnson v. Kay*, 860 F.2d 529, 537 (2d Cir.1988)). To ultimately prevail on the merits, Plaintiffs would have to prove, by clear and convincing evidence that (1) the Local engaged in a series of oppressive acts; (2) the actions taken against them were part of this series of oppressive acts; and (3) the free speech rights of union members were directly threatened as a result. *See Cavelli v. New York City Dist. Council of Carpenters*, 816 F. Supp. 2d 153, 167 (E.D.N.Y. 2011).

Plaintiffs plead no series of oppressive acts, established history or articulated policy; they show no resulting threat to the free speech rights of union members. Their claim of their entitlement comes down to two conclusory statements from an attorney declaration: "Plaintiffs also assert that this misuse of power may be seen as a "scheme to suppress dissent" and "Defendant Torrence has insured that no opposition voices are heard during the course of an election campaign, a period when the voices of opposition are the most voices important to be heard." Soto Decl. ¶ 5. This is patently insufficient on its face and all the more so when Defendants explain each and every one of the complained of acts on legitimate grounds,

underpinned by Plaintiffs' inappropriate behavior.  Accordingly, Plaintiffs have not established any likelihood of success sufficient to justify injunctive relief.

### 4. *Plaintiffs have failed to exhaust internal union remedies*

Plaintiffs attempt to explain away their failure to pursue internal union remedies beyond the Election Committee by claiming that "Plaintiffs' remedies thereafter, were both uncertain and unclear, since the union's Executive Board, which controlled the next step in the remedial process, is controlled by candidates running for re-election with Torrence." Soto Decl. ¶ 6c. Plaintiffs argue that the removals from appointed positions were unwarranted under the Local Constitution.  The Torrence Declaration, manifests a different interpretation of the Local's Constitution's language.  Torrence Dec. ¶ 34. The Court should not usurp the Local's interpretation of its own Constitution

The statement that the Local's Executive Board controlled the next step in the remedial process is simply false.  The Local's Constitution makes clear that Election Committee decisions are appealed not to the Local Executive Board, but to the National Union.  Local Constit., Art. 12, § 17; (appeals from all local election committees are to National Election Appeals Committee headed by National's President); National Constit. Art. 12, § 8-10 (setting out the process for appeals of local election committee decisions).  Plaintiffs also failed to initiate other aspects of the internal union processes.  If they felt the actions taken against them constituted unauthorized discipline, or discipline imposed in the absence of due process guarantees that the Local Constitution provides (such as the right to a hearing), they might have brought internal union charges against President Torrence herself for violating the Local Constitution.  Local Constit. Art. 15, §1(a).

The law starts from the premise that a union's internal affairs should not be interfered with lightly and that unions should be self-governing and free from judicial oversight. For this reason, Plaintiffs are required to exhaust internal union remedies before seeking outside intervention. *See* Local Constit. Art. 15, §3(c) (member must exhaust internal union remedies before bringing dispute before the courts); LMRDA § 101(a)(4), 29 U.S.C. §411(a)(4) (authorizing such provisions for the Title I claims such as for reinstatement); LMRDA §402(a)(1), 29 U.S.C. § 482(a)(1) (Secretary of Labor requires exhaustion of internal union remedies before addressing alleged Title IV election violations). Plaintiffs' failure to exhaust internal union remedies is another ground for finding that they have failed to meet their burden of demonstrating a clear or substantial likelihood of success on the merits. *See, e.g., Bernard v. Local 100*, at 832-33.

5. ***The balance of the equities and public policy and interest weigh against granting the injunction***

The Court addresses the balancing of the equities by asking which party will suffer the more severe harm: the party opposing the injunction if it is granted or the party seeking the injunction if it is denied. *See, e.g., Gund, Inc. v. Golden Bear Co., Ltd.*, 92 CIV. 8555 (LJF), 1992 WL 392602 (S.D.N.Y. Dec. 10, 1992). In this case, it is the Local which will suffer the greater harm if the injunction is granted. As demonstrated above, the Department of Labor, through the processes of LMRDA Title IV, has been designated as the means through which any harm that the Plaintiffs allege can be repaired. On the other hand, not only would granting the injunction result in an expenditure of Local funds in aid of a campaign that candidates are otherwise required to fund themselves, it could also, ironically, end up skewing the very result that the Court would wish to keep free of any factor other than the merits or worthiness of the particular candidates.

The leading treatise on the LMRDA has noted that "the Department of Labor as a policy matter has avoided pre-election investigation of election issues ..... Given the possible effects on the election that a publicized pre-election investigation by the Department could produce, this policy appears sensible." Osborne, William, *Labor Union Law and Regulation*, Washington, D.C.: BNA, 2006, pp. 268-69. A DOL investigation, that later proved to have been unnecessary would nevertheless place a thumb on the scales of the side calling for the investigation (perhaps knowing all the while that it was unnecessary). Voters might be led to base their electoral decisions on the view that if one party was being investigated, the other must be the more worthy—something caused not by the intrinsic worthiness or unworthiness of the candidates, but by the investigation itself. So, too, with the granting of a preliminary injunction. The grant of an injunction—even if later demonstrated to be unnecessary—advantages the Plaintiffs merely by suggesting that an injunction was necessary.

Plaintiffs' inequitable delay of being able to commence this case in early March, but waiting until the very last minute before the mailing of the ballots to seek judicial relief, further tips the equities in Defendants favor. "One who seeks equity must do equity." They should not be allowed to benefit from the haste to decide they made necessary by their inequitable behavior.

There is another public interest at work here as well, however: the right to free speech. If, by means of a preliminary injunction, a union can be made to pay for the distribution of a candidate's campaign materials, and made to look as though it had violated that candidate's rights, merely for providing members the sort of factual, unbiased and non-partisan information that is contained in the "Metro Minute Mail," what union would ever risk communicating with its members in whatever period might be deemed "too close" to an election to allow for communication without these risks? Granting a preliminary injunction here would chill the very

speech that this Court would most want to promote and protect: information on matters of importance that allows voters to choose a candidate based on his or her policy positions and accomplishments, not on the volume of praise for themselves and criticism of their opponents that they can get someone else to pay for.

## CONCLUSION

Plaintiffs have failed to meet their heavy burden of irreparable harm, likelihood of success on the merits or equity. Accordingly, Plaintiffs' request for injunctive relief should be denied, with whatever further relief to Defendants this Court deem fair and appropriate.

Dated: New York, New York
     March 25, 2012

PITTA & GIBLIN, LLP

By: _____
     Barry N. Saltzman
120 Broadway, 28th Floor
New York, New York 10271
(212) 652-3827
bsaltzman@pittagiblin.com

Of counsel:
Vincent F. Pitta, Esq.
Michael Dzialo, Esq.